JUSTI et al. v. CLARK.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

No. 730.

1. PATENTS—VALIDITY OF REISSUE—COLLATERAL ATTACK.

The courts cannot declare a reissue patent fraudulent and void in a collateral proceeding on the ground that the petition for the reissue did not state facts authorizing the commissioner to grant the same, since the statute does not prescribe the mode by which the required facts must be shown, and it must be presumed that the commissioner acted upon sufficient proof.

2. SAME—INVENTION—DENTAL SPITTOON.

The Hurlbut reissue patent, No. 11,696 (original No. 563,664), for an improved dental spittoon, consisting of an outer and an inner bowl, the inner being pivoted and revoluble by means of a jet of water directed tangentially against its inner surface, which also forms a water veil or sheet over its inner surface, was not anticipated by anything in the prior art, nor by the Bardsley rotary fluid motor (patent No. 509,644), but discloses patentable invention; and the device described marks a distinct

advance over anything in previous use, in the essential matters of sightliness and cleanliness. The first four claims also *held* infringed.

Woods, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

For opinion below, see 100 Fed. 855.

The action in the Circuit Court was to restrain the appellants from infringing re-issue Letters Patent No. 11,696, granted September 27, 1898, to Frank Hurlbut for a dental spittoon, and by him assigned to the appellee. The original patent was No. 563,664, issued July 7, 1896.

The material portion of the original patent, together with its drawings, and the four claims sued upon (contained also in the re-issue), is as follows:

"My invention relates to that class of spittoons used by dentists, physicians, and other specialists where it is desirable to have running water in the spittoon for the purpose of cleansing the same.

"For further description of my invention reference will be had to the following specification, in which—

"Figure 1 is an elevation of my invention, the right half being in section. Fig. 2 is a plan view of the same. Fig. 3 is a transverse section on line XX of Fig. 1. Fig. 4 is an enlarged vertical section of the parts shown in section at the lower end of Fig. 1. Fig. 5 is a plan view of the fixture E, showing the perforations 1 1 through the bottom plate of the same. Fig. 6 is a plan view of the fixture D, showing the perforations 2 2 in the plate of the same. Fig. 7 is a side elevation of the valve fixtures and section, showing one style of swiveled injector 1. Any style or pattern of swiveled injector will serve the purpose.

"My improvement may be attached to a permanent or a movable stand or to the wall or to some part of an operating chair and is further provided with an outer and an inner bowl, the outer bowl remaining stationary upon fixtures, while the inner bowl may be continuously rotated by means of water discharged against its inner surface through the injector 1.

"Similar characters refer to corresponding parts in all the figures.

"A represents the inner bowl, which is movable upon a pivot, as hereinafter described.

"B represents the outer bowl, which is stationary upon its fixture.

"C is a removable cap or rim fitted upon the top of the outer bowl B and extends over and inside of the upper edge of the inner bowl A. The cap C is made removable, so that the inner bowl A may be lifted out for the purpose of cleansing the parts.

"D is a plate, providing the perforated bottom of the bowl A, and is provided on its under side with a hub D'. The hub D' is provided with a central socket, also the downward-extending shell a". Into the socket is fitted a pivot-stem G. The drawing discloses the pivot-stem G as loosely fitted into the socket of the hub D'. It is immaterial whether it be loosely fitted or rigid.

"E is a solid fixture forming the bottom of the outer bowl B and is provided on its under side with a hub J. The hub is provided with a cone-shaped opening, into which is fitted a socket-post F. The fixture E is also provided with the cone-shaped shell E', extending downward to the fixtures c and d, connecting it with a waste-pipe. The bottom of the fixture E is perforated, as shown at 1 1, Fig. 5.

"F is a tubular post, cone-shaped near its upper end and is thus fitted into the cone-shaped opening in the hub J of the fixture E. Into the lower end of the post F is fitted an adjustable bolt a. The bolt a being adjustable, it may be raised and thus provide a bearing for the pivot-stem G.

"G is a pivot-stem, on which is mounted the revolving bowl A.

"H represents a socket on the end of an arm L of any suitable fixture for securing the spittoon in any desirable position or to any desired object.

"a is an adjustable stool-bolt fitted into the end of the socket-post F, and in addition to providing a pivot-bearing for the pivot-stem G it provides a means of adjusting the inner bowl A up or down.

"b is an annular-ring of hardened metal fitted into the upper end of the post F to provide a side bearing for the pivot-stem G.

"c is a fixture secured to the lower end of the chamber formed by the shell E' by means of the lock-nut d, and is for the purpose of connecting the spittoon to a waste-pipe.

"f and h are fixtures provided on the side of the outer bowl B for supporting the supply-pipe and may be connected in suitable manner to any waste-pipe or hydrant.

"g is the water-supply pipe supported by the fixtures f and h, and provided near to the top of the bowl with an ordinary cross-pipe fitting, the lower arm of the cross being attached to the supply-pipe g. (See Figs. 2 and 7.) The upper arm may be extended and provided with a glass filler n. (See Fig. 7.) The two side arms of the cross may be extended and provided each with an ordinary stop-cock i i. (See Fig. 2.)

"j is an extension from one of the valves i and connects the same with the globe k.

"k is a globe-shaped fixture provided with a two-way opening, into one of which is fitted the pipe j and through the other extends the injector l.

"l is the injector, through which water is discharged into the bowl A. This injector is fitted through the globe k and is designed to swivel in the same. The lower end of the injector terminates with a bent nozzle. At one side of the injector is provided a thumb-piece m for the purpose of turning the same in the globe k.

"The upper end of the injector l, at a point opposite the pipe j, is provided with one or more openings. so that water may be admitted to the injector regardless of the angle at which the nozzle may be set, the inflow of water being controlled by the valve i. The valves i i are connected with the cross-pipe fitting with the swivel-joint, so that the fixtures extending inside of the bowl may be turned upward on the swivel-joint and thereby removed from over the bowl in order that the inner bowl may be removed for the purpose before described.

"o is a bracket fitted loosely around and extending from the pipe n for supporting a water-glass p. Desiring to fill the glass the bracket o may be swung around, bringing the glass under the water-pipe n.

"r is a stop-cock on the pipe n.

"q is an extension from one of the valves i, and to which it is intended to connect a saliva-ejector.

"The operation of my invention is as follows: Assume the spittoon to be in position resting in the socket H of the arm L, said arm L being secured as before described and the water-pipe g being connected with a supply-pipe by a section of hose or otherwise, as desired, and the fixture c being likewise connected with a waste-pipe. Desiring to operate the bowl the operator will open the stop-cock i opposite the injector k l, admitting water to the bowl through the nozzle end of the injector l. By means of the thumb-piece m the injector may be turned so as to discharge the water against the inner surface of the bowl A at any angle desired. The force of the water thus discharged imparts motion to the inner bowl and causes it to revolve upon its pivot-stem G. The speed at which the bowl revolves is controlled by the force of the supply and the angle at which the injector is set. The outlet from the bowl is through the perforations 2 2 and 1 1 of the plates D and E and thence through fixture c to the waste-pipe. (See Figs. 4, 5, and 6.) In the event of an overflow of the bowl A the water may pass down the space between the outer and inner bowl and through the plate E to the waste-pipe.

"The air-space a', provided between the upper end of the post F and the under side of the hub D', and inclosed by the downward-extending shell a'' of the hub D', is intended to act as a ram in preventing water from working up over the post F and around the pivot-stem G.

"Having thus described my invention, what I claim as new, novel, and desire to secure by Letters Patent of the United States, is—

"1. In a spittoon, an inner and an outer bowl, the inner bowl being revoluble; and a water-injector adapted to direct a jet of water against said revoluble bowl to revolve the same.

"2. A dental spittoon having an outer and an inner bowl, the inner bowl being revoluble within the outer bowl; a water-injector adapted to throw a stream of water against the inner surface of the inner bowl; and an adjustable fixture carrying the injector by which it is made removable from the inner bowl.

"3. In a dental spittoon, an inner and an outer bowl, the inner bowl being revoluble; a water-injector held to direct water against the inner surface of the inner bowl to revolve the same; and a fixture which holds the water-injector, the water-injector being adjustable in the fixture to change the direction of the stream which it directs against the revoluble bowl to modify the speed of the revolution of the bowl.

"4. In a dental spittoon, an outer and an inner bowl, the inner bowl being revoluble in the outer bowl; the water-injector for directing the stream of water against the surface of the inner bowl to revolve the same; and a removable cap placed over the upper edges of the two bowls secured to the outer bowl."

The claims added by the reissue—fifth, sixth and seventh—are as follows:

"5. In a dental spittoon, the combination of an outer bowl and an inner bowl having a space located between them and open at its top and bottom, the inner bowl supported at its bottom and having an always-open outlet or drain, a removable cap arranged above the upper edges of the two bowls and over said space and means for supplying water to the inner surface of the inner bowl and continually maintaining a thin sheet of water upon such inner surface.

"6. In a dental spittoon, the combination of an outer bowl and an inner bowl having a space located between them and open at its top and bottom, the inner bowl supported at its bottom and having an always-open outlet or drain, means for supplying water to the inner surface of the inner bowl and continually maintaining a thin sheet of water upon such inner surface and a removable cap arranged above the upper edges of the two bowls but providing communication between the inner bowl and said space.

"7. In a dental spittoon, the combination of an outer bowl and an inner bowl having a normal air-space located between them and open at its top and bottom, the inner bowl supported at its bottom and having an always-open outlet at its lowest point, means for supplying water to the inner surface of the inner bowl and continually maintaining a thin sheet of water

upon such inner surface and a cap secured to the outer bowl, out of contact with the inner bowl and adapted to cover the space between the bowls but leaving a space between it and the top of the inner bowl."

There was no substantial dispute that the spittoon manufactured by the appellants is almost an exact copy of the Hurlbut spittoon; but appellants insisted that it was within the uses to which the Bardsley patent could be rightfully adapted.

The Bardsley patent, No. 509,644, issued November 28, 1893, for a rotary fluid motor, together with its drawings, is as follows:

FIG. 1.

FIG. 2.

FIG. 3. FIG. 4. FIG. 5.

"One object of my invention is to construct a rotary fluid motor of an extremely cheap and simple character compared with its efficiency, and one which can be run in either direction at will, a further object being to provide for the ready changing of the direction of rotation of the motor. These objects I attain in the manner hereinafter set forth, reference being had to the accompanying drawings in which—

"Figure 1, is a perspective view of a fluid motor constructed in accordance with my invention. Fig. 2 is a plan view of the same, partly in section; and Figs. 3, 4 and 5, are sectional views illustrating different forms of motor wheel or disk which can be employed.

"My improved fluid motor consists of a disk A secured to a shaft B which is mounted in suitable bearings so as to be free to turn, the disk having upon its outer edge a projecting flange a which is, by preference, bent inward slightly at the top, as shown in Fig. 3. The central portion of the disk may

be in the form of spokes or open work if desired. and the disk may run either horizontally, vertically or at an angle.

"Above and at one side of the disk A is a conical nozzle D which is preferably mounted upon the depending end of a fluid supply pipe F so that it can be turned thereon, the hub or butt b of the nozzle being provided with a handle d for this purpose.

"The nozzle D is so disposed that the jet therefrom will be delivered parallel with a line tangential to the periphery of the disk A and will strike the surface of said disk close to the outer flange, the force of the water being exerted upon the disk and flange and the stream spreading upward on said flange to which it clings by reason of capillary attraction until it is finally discharged by centrifugal force over the edge of the flange, as shown in Fig. 1. The water is thus caused to act upon the disk and flange throughout a considerable portion of the entire circumference of the disk so that I am enabled to obtain almost as high a degree of power as in a bucket motor operated by a jet, especially in cases where the jet is very small and issues with great velocity from the nozzle.

"One important advantage possessed by my improved motor over the ordinary form of bucket motor, moreover, is that it is capable of being run either backward or forward with equal facility, by simply changing the direction of the jet, and in order that this latter result may be readily accomplished I use a pivoted nozzle as shown in Fig. 1, which when adjusted to the position shown by full lines in Fig. 2, will drive the motor disk in one direction, and when adjusted to the position shown by dotted lines in said figure, will drive said disk in the opposite direction.

"In carrying out my invention various forms of flange may be formed upon the disk A in place of that shown in Figs. 1 and 3. For instance, an inwardly curved flange such as shown in Fig. 4 may be used, or a low upturned flange, such as shown in Fig. 5, or in some cases the flange may be dispensed with altogether, as I have obtained good results from a motor in which the jet was simply discharged upon the face of a flat disk, the use of the flange in all cases, however, being preferred, it serves to confine the water to the disk for a longer time, and thus enables it to exert a greater amount of power than if it were not so confined.

"It will be evident that in carrying out my invention, there can be two or more nozzles disposed so as to discharge upon the disk at different points, and the jets can all act upon the same face of the disk or some upon one face and some upon the opposite face of the same, and in other cases there may be more than one disk upon the shaft, each of the disks being acted upon by one or more jets. In some cases, also, the face of the disk may be slightly roughened or provided with fine corrugations, but these should not be such as to break up the jet or cause any rebounding of the water on striking the disk.

"Having thus described my invention, I claim and desire to secure by Letters Patent—

"1. A fluid motor consisting of a disk or plate and a nozzle located above the plate but inclined downward toward the same, and also occupying a position parallel with a line tangential to the periphery of the plate so that it will discharge downward upon the face of the plate, adjacent to the periphery of the same, a jet parallel to such tangential line, substantially as specified.

"2. A fluid motor in which are combined a disk or plate having an upturned flange upon its outer edge, and a nozzle located above the plate but inclined downward toward the same, and also occupying a position parallel with a line tangential to the periphery of the plate, whereby it will discharge downward upon the face of the plate, adjacent to the periphery of the same and within the flange, a jet parallel to such tangential line, substantially as specified.

"3. A fluid motor in which are combined a disk or plate, and a nozzle located above the plate but inclined downward toward the same, said nozzle being pivoted to the supply pipe and capable of being moved thereon to right or left so as to occupy, when in either extreme of movement, a position parallel with a line tangential to the periphery of the plate, substantially as specified."

**Other** patents brought to our attention are as follows:
> No. 102,737, May 3, 1870, D. Wellington.
> No. 102,738, May 3, 1870, D. Wellington.
> No. 155,814, Oct. 13, 1874, W. Stockton.
> No. 163,527, May 18, 1875, S. G. Randall.
> No. 204,793, June 11, 1878, F. Bramer.
> No. 233,495, Oct. 19, 1880, O. Fink.
> No. 241,884, May 24, 1881, O. E. Robinson.
> No. 241,949, May 24, 1881, J. R. Finney.
> No. 274,105, Mch. 20, 1883, E. B. Bliss.
> No. 305,430, Sept. 23, 1884, E. A. Daniel.
> No. 317,251, May 5, 1885, J. J. Walton.
> No. 349,704, Sept. 28, 1886, J. M. Fletcher.
> No. 448,100, Mch. 10, 1891, W. E. Warner.
> No. 486,776, Nov. 22, 1892, S. Haines, et al.
> No. 535,925, Mch. 19, 1895, W. J. Shilling, Jr.
> No. 553,510, Jan. 28, 1896, S. Campbell.
> No. 594,117, Nov. 23, 1897, M. O. Merker.
> No. 597,359, Jan. 11, 1898, G. E. Johnson.

The court found upon final hearing for the appellee, and entered a decree accordingly; from which this appeal is prosecuted.

The errors assigned are, in substance, as follows:

1. "That the reissue was invalid because fraudulently obtained, and because there was no foundation in law for a reissue."

2. "Because the reissue claims are unlawful expansions of the originals, and, therefore, void; and the whole patent is therefore also void."

3. "Because the claims sued on are void for want of patentable novelty."

4. "Because the court erred in finding infringement."

The further facts are stated in the opinion of the court.

R. S. Taylor, for appellant.

L. L. Coburn, Samuel E. Hibben, and J. H. McElroy, for appellee

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

GROSSCUP, Circuit Judge. The injunction against infringement was asked only upon claims (1), (2), (3), & (4) of the re-issue patent. These are identical with the like numbered claims in the original patent. There is nothing, therefore, in the particular re-issued claims, upon which relief is asked, different from the original claims. The decree of the Circuit Court in following the re-issue, did not expand or alter what would have been appellee's right, had there been no re-issue, and the suit had been brought upon the original Letters Patent.

But it is insisted that the claims added in the re-issue (though not brought into this case as a base for an injunctional order) were not within the right of the commissioner to allow, upon the showing of facts there made; and our attention is invited to the petition for reissue, as failing to show facts sufficient to give the commissioner jurisdiction. It is urged, in view of this, and of the progress of the art between the dates of the original and the re-issue Letters, that the success of the appellee in procuring the re-issue is in the nature of a fraud.

The defect of the argument is that it assumes that we have before us, in this case, all the facts that the commissioner had before him in the application for a re-issue; and that we can, in a collateral proceeding, declare the patent fraudulent, on account of the supposed imposition upon the commissioner. The statute relating to the sub-

ject, Section four thousand nine hundred and sixteen, provides: "Whenever any patent is inoperative or invalid by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident or mistake and without any fraudulent or deceptive intention, the commissioner shall on the surrender of such parent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification to be issued to the patentee."

It will be seen that there is in this statute no provision relating to the medium of the required proof. It is not provided that the proof of the facts upon which a re-issue may be granted—the inoperativeness or invalidity of the original patent, through inadvertence, accident or mistake, and without deceptive intention—shall be by affidavit, deposition, or oral testimony. It is not provided that the attention of the commissioner shall be called to such facts by any set petition, or other paper writing. This may be done, so far as statutory procedure goes, by oral testimony. All that the statute contemplates is that the judgment of the commissioner shall be satisfied; and this is, of course, presumed from the fact that the re-issue was granted. In the absence of the whole case submitted to the commissioner—petition, affidavits, oral testimony and all—upon which he acted, we can not determine, had we the power, that there were not before him facts sufficient to give him jurisdiction to grant a re-issue, or that the commissioner was misled. There seems to us to be no error in this particular of the case.

This brings us to the questions of invention and patentability. The Hurlbut dental spittoon consists of an inner bowl set within an outer bowl, the inner one so arranged that it may revolve, without much friction, upon a pin point bearing. Against the inner surface of the inner bowl a jet of water is thrown tangentially, so adjusted in quantity and pressure that, while the bowl is caused to revolve, the revolution is accomplished easily and quietly, and the water permitted to spread like a flushing veil or sheet over the whole surface. Overflow is prevented by an annular ring, and space for the escape of air from the waste pipe is found between the outer surface of the inner bowl and the inner surface of the outer. The effect is noiselessness, a tasteful appearance, and a sense of purity and cleanliness. The spittoon immediately superseded the dental spittoons preceding it.

The White dental spittoon, in existence before 1890, seems to have been the point at which the art, up to the Hurlbut spittoon, had reached its climax. The White spittoon was a single stationary bowl, through which rose centrally, nearly to the level of the rim, a vertical rod carrying a water-spraying device that, turning pivotally on suitable bearings, distributed the water over the inner surface of the bowl, subjecting its surface to a spray, such as comes to a lawn from a water sprinkler. It was, to a certain degree, cleanly and tasteful, and went into general use; but its differentiation from the Hurlbut spittoon, appearing six years later, is well marked. In the White

spittoon the sprinkler revolves, while the bowl stands still; in the Hurlbut it is the bowl that is revoluble. In the former the power is applied to the swinging cross-arms through the vertical rod by a construction known as Barker's mill; in the latter the jet of water, striking the inner surface of the bowl, is, at once, the power that revolves it, and its cleanser. In the White there always stands up in the center of the bowl—a catch-all for the discharges from the patient's mouth—this upright rod, and its cross-arms, themselves incapable of self-cleansing; in the Hurlbut there is no exposed portion that is not self cleansed. The striking advance of the Hurlbut over the White spittoon is thus manifest.

The other patents cited—the Finney, Bliss, Fletcher, and Warner —are of a like construction, each having the stationary bowl, supplied with stationary water distributors. They fall short, therefore, as did the White, of the peculiar adaptation that gives to the Hurlbut spittoon its perfection as a dental bowl.

Usually in any art the approach to the highest attainment is gradual; the final result reached is but a step beyond its immediate predecessor. But in the art of dental spittoons the approach to the Hurlbut invention seems to have been by a long leap from its immediate predecessor. The transition from the White to the Hurlbut is in the nature of a decided departure, if not a new creation. We are of the opinion that the thought that conceived this new help to the ills of mankind is invention, and that its embodiment, in the mechanical means employed, completes the act as patentable invention.

But though nothing is brought forward from the dental art as anticipatory of the transition from the White to the Hurlbut spittoon, the Bardsley patent—confessedly in another field—is urged as having made the Hurlbut spittoon so obvious, that what followed could only have been mechanical adaptation. We can not concur in this view.

The Bardsley patent was for a rotary fluid motor. Its sole purpose was to obtain power from a jet of water, and transmit it by a shaft to some other apparatus. It carried with it no thought of, or provision for, the flushing of water that causes self cleansing; it contained, indeed, no purpose of self cleansing. There was in it no basin, as a receptacle for the discharges from the patient; no provision for noiselessness; no suggestion of sightliness; none of the details that, taken together, constitute the tout ensemble of the Hurlbut spittoon. It is true that, the underlying idea of the Hurlbut spittoon, well in mind, a glance at the Bardsley motor might reveal, in rough, the means for its mechanical embodiment; but the gist of invention is just this conception of the underlying idea—the mental, rather than the manual act—the burst of thought, rather than the reduction of the thought to practice. The Bardsley motor, in our opinion, had nothing in it that was calculated to reveal, in its entirety, the Hurlbut dental spittoon.

Indeed, the Bardsley motor only utilized a well known law of nature—that a jet of water, applied tangentially to the inner surface of a basin nicely pivoted, would tend to revolve it. This had been partially exemplified, for many years, in preceding water motors;

and widely exemplified in the revoluble tumblers upon nearly every soda fountain counter. It was a known law of nature when the early dental spittoons were devised, with their stationary bowls and stationary water-distributer; and when the White spittoon was conceived, with its revoluble distributer; but, until Hurlbut's time, it was not thought of in solving the problem of a sightly and sanitary dental basin. Is not this fact significant? Is it not persuasive that Hurlbut's conception was invention rather than mere skill—a flash of the intellect, creative and helpful, rather than the plodding advance of the mechanic. Taken altogether, we regard the Hurlbut device as the result of an inventive thought, suitably reduced to practice, and, therefore, patentable.

There was no error in the decree of the Circuit Court, and it is accordingly affirmed.

WOODS, Circuit Judge (dissenting). I am not able to agree that the Hurlbut device embodies invention, though, the Bardsley patent out of the way, its patentability I think should be conceded. Its meritorious feature is the revoluble bowl washed by the water which revolves it. As a mechanism it is in this particular completely anticipated by the Bardsley device, which in the form illustrated in the patent is capable of use as a spittoon, while if its disk be given the depth and contour of a dental cuspidor it becomes the complete exemplification of Hurlbut's construction. In the patent it was called a "motor," but was it for that reason any less a mechanism of which Hurlbut or any other mechanical inventor was bound to take cognizance than if it had been stated in the patent that it might also be used as a self-cleansing cuspidor?

In respect to invention in the adaptation of an existing device to a new use, the rule is thus stated in Potts & Co. v. Creager, 155 U. S. 597, 608, 15 Sup. Ct. 194, 199, 39 L. Ed. 275, 279:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

The significance of the last sentence should not be overlooked. The following cases cited in the briefs afford pertinent illustrations of the application of the rule: American Road-Mach. Co. v. Pennock & Sharp Co., 164 U. S. 26, 17 Sup. Ct. 1, 41 L. Ed. 337; Iron Works v. Fraser, 153 U. S. 332, 14 Sup. Ct. 883, 38 L. Ed. 734; Trimmer Co. v. Stevens, 137 U. S. 423, 11 Sup. Ct. 150, 34 L. Ed. 719; Aron v. Railroad Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272; Briggs v. Ice Co., 20 U. S. App. 374, 8 C. C. A. 480, 60 Fed. 87; Gustin v. Mill Co., 9 U. S. App. 301, 3 C. C. A. 474, 53 Fed. 120; Thomson-Houston Electric Co. v. Western Electric Co., 34 U. S. App. 186, 16 C. C. A. 642, 70 Fed. 69; Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856. These and many like cases, as I understand them, proceed upon the theory that the mechanical art

is a unit, and that every mechanical invention is presumed to have been made with a full knowledge of all that had been accomplished before in all branches of mechanism; so that when the question arises whether there was invention in adapting an old device to a new use, or whether a supposed new device designed for a new or old use was in fact an adaptation of an old device, it must be determined by the rule quoted from the opinion in Potts & Co. v. Creager; much depending on the nature of the changes required to effect the new adaptation. The changes which Hurlbut had to make in the Bardsley mechanism in order to convert it into the revolving bowl of his cuspidor, washed by the water which turned it, were certainly slight and obvious, involving nothing beyond the skill of a mechanic conversant with the art. Indeed, nothing was necessary except to cut away so much of the shaft, B, in the Bardsley motor as rises above the bottom of the disk, and apply well-known means for the discharge and carrying away of the water. It is significant that Hurlbut's original application, filed March 18, 1895, followed the issue of the Bardsley patent on November 28, 1893, by less than sixteen months; and, in view of the close resemblance of the two devices, it is not unreasonable to infer that one was the outgrowth of the other.

If it be insisted that the Bardsley device is to be distinguished because its only intended function was as a "fluid motor," the answer is that in the cuspidor of Hurlbut it has the same function. If it be said to run nothing but itself, it is nevertheless a motor. The rotating part of the cuspidor may be regarded, perhaps, with equal fairness, from either of two points of view,—as a modified form of the Bardsley motor, or as a Bardsley motor with a bowl attached, to which it imparts a motion identical with its own. The disk on which the water impinges is described in the specification as having upon its outer edge a projecting flange, which by preference is bent inward slightly at the top; and the central portion is described as being, if desired, in the form of spokes or open work. To substitute for the central portion, whether solid or consisting of spokes or open work, a bowl, of whatever shape, would not change the essential character of the structure, whether the bowl be attached to, or made integral with, the flange. In either form the presence of the Bardsley motor, acting as a motor to revolve the bowl, is evident.

In the case of Johnson v. McCurdy (decided to-day by this court) 108 Fed. 671, it is said:

"Nor can the Bardsley patent be construed to rightfully exclude others from using a jet of water tangentially applied to the inner surface of the bowl to revolve the bowl. This was a law of nature, well known before the Bardsley device."

If this be true, it is equally fatal to the Hurlbut device, which, without the revolving bowl moved by a tangential jet of water, is manifestly without patentable novelty. The other parts of the combination were in familiar use in earlier devices, in substantially similar relations and serving the same uses as in this combination. Neither patent, however, as I conceive, is subject to the objection stated,—not more than a patent for a turbine or other form of wheel

intended to be moved by water, or for a device designed to catch the wind for the purpose of utilizing its power. No law of nature tells how the jet of water shall be made to impinge, nor how to construct a device to which it may be effectively applied. Whatever the distance from White to Hurlbut, that from Bardsley to Hurlbut was but a step along a lighted passage.